# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

STATE OF KANSAS, BY AND THROUGH THE KANSAS DEPARTMENT FOR CHILDREN AND FAMILIES,

Intervenor-Appellant, Cross-Appellee,

v.

SOURCEAMERICA; LAKEVIEW CENTER, INC.,

Plaintiffs-Appellees,

and

UNITED STATES DEPARTMENT OF EDUCATION; UNITED STATES DEPARTMENT OF THE ARMY; UNITED STATES DEPARTMENT OF DEFENSE; BETSY DEVOS, in her official capacity as Secretary of Education; MARK T. ESPER, in his official capacity as Secretary of the Army; PATRICK M. SHANAHAN, in his official capacity as Acting Secretary of Defense,

Defendants-Appellees, Cross-Appellants.

On Appeal from the United States District Court
for the Eastern District of Virginia

## BRIEF FOR APPELLEES/CROSS-APPELLANTS

JOSEPH H. HUNT
  *Assistant Attorney General*

G. ZACHARY TERWILLIGER
  *United States Attorney*

MARK B. STERN
LAURA E. MYRON
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7228*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4819*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF JURISDICTION ............................................................................... 3

STATEMENT OF THE ISSUES ..................................................................................... 4

PERTINENT STATUTES AND REGULATIONS ......................................................... 4

STATEMENT OF THE CASE ....................................................................................... 5

    A. Statutory Background ........................................................................................ 5

        1. The Javits-Wagner-O'Day Act ................................................................. 5

        2. The Randolph-Sheppard Act .................................................................... 6

        3. The John Warner National Defense Authorization Act of 2007 ............. 9

    B. Factual Background ........................................................................................... 10

    C. Arbitration Proceedings .................................................................................... 13

    D. District Court Proceedings ................................................................................ 14

SUMMARY OF ARGUMENT ....................................................................................... 16

STANDARD OF REVIEW ............................................................................................. 23

ARGUMENT ................................................................................................................... 23

  I. The District Court Correctly Concluded That Army Contracts
     For Dining Facility Attendant Services At Fort Riley Are Not
     Covered By The RSA. ..................................................................................... 23

    A. Army DFA Services Contracts For Janitorial And Custodial
       Services Are Not For The Operation Of A Vending
       Facility And Thus, Are Not Subject To The RSA. ......................................... 23

    B. Kansas Has Identified No Respect In Which The Army DFA
       Contract At Issue Here Would Be Within The Scope Of The RSA. ........... 29

    C. The Secretary's March 2018 Letter Should Be Accorded No Deference. ... 32

    D. The District Court Correctly Concluded The Army Did Not Violate
       The No-Poaching Provisions Of The NDAA. ............................................... 37

  II. The Army's Decision To Rely On A DFA Services Contract Did
      Not Violate The RSA's Review Requirement. ....................................................... 38

CONCLUSION ............................................................................................................ 47

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Auer v. Robbins,*
   519 U.S. 452 (1997) ................................................................. 33

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,*
   467 U.S. 837 (1984) ...........................................................18, 32

*Christensen v. Harris County,*
   529 U.S. 576 (2000) ...........................................................19, 35

*General Dynamics Land Sys. v. Cline,*
   540 U.S. 581 (2004) ................................................................. 41

*Hughes Aircraft Co. v. Jacobson,*
   525 U.S. 432 (1999) ................................................................. 39

*IBP, Inc. v. Alvarez,*
   546 U.S. 21 (2005) ................................................................... 26

*Jones v. United States,*
   527 U.S. 373 (1999) ................................................................. 41

*Kansas Dep't for Children & Families v. SourceAmerica,*
   874 F.3d 1226 (10th Cir. 2017) ............................................. 13

*Kansas Dep't for Children & Families v. United States,*
   No. 15-cv-4907, 2016 WL 3129397 (D. Kan. Feb. 26, 2016) ................................... 13

*Kisor v. Wilkie,*
   139 S. Ct. 2400 (2019) ............................................................ 33

*Knox Creek Coal Corp. v. U.S. Sec'y of Labor,*
   811 F.3d 148 (4th Cir. 2016) .................................................. 32

*Long Island Care at Home, Ltd. v. Coke,*
   551 U.S. 158 (2007) ................................................................. 34

*Minnesota Dep't of Econ. Sec. v. Riley,*
   107 F.3d 648 (8th Cir. 1997) ................................................. 43, 44

*Minnesota Dep't of Jobs & Training v. Riley,*
   18 F.3d 606 (8th Cir. 1994) ............................................. 22, 43, 44

*Mississippi Dep't of Rehab. Servs. v. United States,*
   61 Fed. Cl. 20 (2004) ................................................................ 27

*NISH v. Cohen,*
   247 F.3d 197 (4th Cir. 2001) ............................. 9, 11, 23, 33, 34

*NISH v. Rumsfeld,*
   348 F.3d 1263 (10th Cir. 2003) ............................................. 33

*Reves v. Ernst & Young,*
   507 U.S. 170 (1993) ................................................................. 26

*Sauer v. U.S. Dep't of Educ.,*
   668 F.3d 644 (9th Cir. 2012) ...................................... 9, 20, 37

*Scott v. United States,*
   328 F.3d 132 (4th Cir. 2003) ................................................ 23

*Sierra Club v. U.S. Army Corps of Eng'rs.,*
   909 F.3d 635 (4th Cir. 2018) .......................................... 19, 34

*Sierra Club v. U.S. Dep't of the Interior,*
   899 F.3d 260 (4th Cir. 2018) ..................................... 19, 35, 36

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ..................................................... 19, 34, 35

*United States v. Al-Hamdi,*
   356 F.3d 564 (4th Cir. 2004) ................................................ 38

*United States v. Bestfoods,*
   524 U.S. 51 (1998) ......................................... 18, 25, 28, 32, 35

*United States v. Mead Corp.,*
   533 U.S. 218 (2001) ................................................. 18-19, 32

*Washington State Dep't of Servs. for the Blind v. United States*,
    58 Fed. Cl. 781 (2003) ............................................................. 27


**Statutes:**

Administrative Procedure Act:
    5 U.S.C. §§ 551-559 ............................................................. 14
    5 U.S.C. §§ 701-706 ............................................................. 8, 14
    5 U.S.C. § 702 ...................................................................... 3

Javits-Wagner-O'Day Act, 41 U.S.C. §§ 8501-8506 ................... 5
    41 U.S.C. § 8503(c) .............................................................. 6
    41 U.S.C. § 8504(a) .............................................................. 6

John Warner National Defence Authorization Act of 2007,
    Pub. L. No. 109-364, 120 Stat. 2083 (2006) .................. 9, 21, 38

Randolph-Sheppard Act, 20 U.S.C. §§ 107-107f ....................... 6
    20 U.S.C. § 107(a) ................................................... 6, 23, 27, 28
    20 U.S.C. § 107(b) ............................... 1, 2, 4, 5, 6, 8, 16, 20, 21, 23,
                                 25, 26, 28, 39, 40, 44
    20 U.S.C. § 107(b)(2) ....................................... 2, 6, 21, 41, 42
    20 U.S.C. § 107a(a)(1) .......................................................... 6
    20 U.S.C. § 107a(a)(5) .......................................................... 7
    20 U.S.C. § 107a(b) .............................................................. 7
    20 U.S.C. § 107a(d)(1) .......................................................... 26
    20 U.S.C. § 107a(d)(2)(B)(ii) ............................................... 26
    20 U.S.C. § 107a(d)(3) .......................................................... 26
    20 U.S.C. § 107b .................................................................. 7
    20 U.S.C. § 107d-1 ............................................................... 8
    20 U.S.C. § 107d-1(b) ........................................................... 8
    20 U.S.C. § 107d-2 ............................................................... 8
    20 U.S.C. § 107d-2(a) ...................................................8, 9, 20, 37
    20 U.S.C. § 107d-3(e) ......................................................26, 28
    20 U.S.C. § 107e(7) ...........................................................7, 23


28 U.S.C. § 1291 ...................................................................... 3


28 U.S.C. § 1331 ...................................................................... 3

**Regulations:**

34 C.F.R. § 395.1-395.38 ................................................................ 6

34 C.F.R. § 395.1(d) ...................................................................... 33

34 C.F.R. § 395.33(a) ................................................................. 7, 28

34 C.F.R. § 395.33(b) ..................................................................... 7

34 C.F.R. § 395.33(d) .................................................................... 28

**Rule:**

Fed. R. App. P. 4(a)(3) ................................................................... 3

**Legislative Material:**

S. Rep. No. 93-937 (1974) ....................................................22, 42, 43

**Other Authorites:**

*American Heritage Dictionary*
   (3d ed. 1992) ....................................................................25-26
   (4th ed. 2000) ...................................................................... 28

Headquarters, Department of the Army:
   Army Regulation 30-22, *Army Food Program*, (July 24, 2012)
   https://go.usa.gov/xySdE ..................................................... 10

Memorandum Ruling, *Louisiana Office of Rehab. Servs.*
   *v. United States Dep't of the Air Force*,
   No. 98-cv-1392, (W.D. La. Mar. 29, 2000)................................ 28

*Oxford English Dictionary* (2d ed. 1989) ............................................. 36

*Webster's New International Dictionary* (2d ed. 1958) ........................ 26

## INTRODUCTION

The Randolph-Sheppard Act (RSA) provides that blind vendors shall be given priority for the "operation of vending facilities on Federal property." 20 U.S.C. § 107(b). The principal issue in this case is whether this provision includes contracts for custodial and janitorial support services at a dining facility that is operated by Army personnel. The district court correctly concluded that contracts of this kind are not contracts for the "operation of vending facilities." *Id.*

The court's decision reflects the fact that the Army uses two different models in operating its dining facilities. In the first model, the Army enters into what is called a Full Food Services contract, under which the contractor is responsible for all "activities that comprise the full operation of an Army dining facility," including the "requisitioning, receiving, storing, preparing, and serving of food," as well as "the performance of related administrative . . . functions." 1.J.A. 148 (Army Regulation 30-22, *Army Food Program*, 58 (July 24, 2012)). The Army recognizes that these Full Food Services contracts fall within the scope of the Randolph-Sheppard Act.

In the second model, the Army itself operates the dining facility and military personnel provide the food preparation and service functions, including requisitioning, receiving, storing, preparing, and serving food, as well as headcount and payment services, and other administrative functions. *See* 1.J.A. 291-94. Where the Army itself operates the facility, it enters into what are known as Dining Facility Attendant (DFA) contracts which include "[t]hose activities required to perform janitorial and custodial

duties within dining facilities," including "sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions." 1.J.A. 147-48 (Army Reg. 30-22, at 57-58). This case involves a Dining Facility Attendant contract, which, as the district court correctly recognized, does not fall within the Randolph-Sheppard Act. The court explained that "[t]he plain language of the RSA makes clear that its preference applies only where the vendor exercises control or management over the functioning of the vending facility as a whole." 6.J.A. 2492.

The district court erred, however, when it concluded that, under the RSA, the Army's decision to rely primarily on Army personnel to carry out the functions of the dining facilities with the support of a DFA services contract for limited custodial and janitorial services required advanced approval from the Secretary of Education. The statute vests in the Secretary of Education certain responsibilities for implementing the Randolph-Sheppard Act and provides that the Secretary should ensure that "wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States." 20 U.S.C. § 107(b)(2). In furtherance of that end, the RSA provides that in some circumstances an agency must obtain approval from the Secretary before imposing a "limitation on the placement or operation of a vending facility." *Id.* § 107(b).

The district court acknowledged that it was "puzzling" to think the "RSA requires the Army to justify to the Secretary of Education the Army's decision to use

Army cooks in its dining facilities." 6.J.A. 2497 n.21. It would be puzzling if the statute in fact required that result, but it does not. The district court's understanding of the term "limitation" is broader than can be supported by the statute. Congress did not intend to provide the Secretary of Education with approval authority over any federal agency action that might have an adverse effect on RSA vendors. It is not a limitation on the operation or placement of a vending facility for the military to make a decision about troop deployment that results in a restructuring of its dining facility contracts with indirect effect on an incumbent RSA vendor. Because it is not a limitation within the meaning of the Review Requirement, there is also no basis for the Army to have made a finding that the continued operation of the vending facility under a Full Food Services contract is adverse to the United States as required by the Review Requirement.

## STATEMENT OF JURISDICTION

Plaintiffs filed their complaint in the United States District Court for the Eastern District of Virginia invoking that court's jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702. On March 15, 2019, the district court entered an order partially granting and partially denying each of three summary judgment motions filed by plaintiffs, the federal government defendants, and intervenor-defendant, respectively. 6.J.A. 2508. On April 1, 2019, the district court issued its amended final judgment. The intervenor-defendant filed a notice of appeal on April 22, 2019. *See* 6.J.A. 2514. The government filed a notice of cross-appeal on May 14, 2019. *See* 6.J.A. 2516; Fed. R. App. P. 4(a)(3). This Court has jurisdiction under 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

This case arises out of a decision by the Army to transition the military dining facilities from a Full Food Services contract where the vendor was responsible for all activities that comprise the full operation of an Army dining facility to a model where military personnel provide the food service, preparation, and managerial functions, and a contractor is responsible for only custodial and janitorial services. The questions before this Court are:

1. Whether the district court correctly concluded that the contract for janitorial and custodial services within Army dining facilities at Fort Riley, Kansas, was not a contract for "the operation of vending facilities" and thus was outside the purview of the Randolph-Sheppard Act. 20 U.S.C. § 107(b).

2. Whether the court erred when it concluded that the Army's decision to employ its own soldiers in the dining facilities with the support of a custodial and janitorial services contract was a "limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States," such that advance review and approval from the Secretary of Education was required. 20 U.S.C. § 107(b).

# PERTINENT STATUTES AND REGULATIONS

Pertinent statutes are reproduced in the addendum to this brief.

# STATEMENT OF THE CASE

## A.     Statutory Background

This case arises out of the decision by the Army to secure a contract for custodial and janitorial services for dining facilities at Fort Riley, Kansas, pursuant to the Javits-Wagner-O'Day Act, which establishes a procurement list of products and services produced and provided by qualified nonprofit agencies that employ blind and significantly disabled individuals.  Federal agencies must then procure those products and services from the list.  *See* 41 U.S.C. §§ 8501-8506.  The Kansas Department for Children and Families ("Kansas") challenged the solicitation, arguing that the Army was required to solicit the contract through a competitive process, applying the Randolph-Sheppard Act, which provides that blind individuals receive priority in the operation of vending facilities on federal property.  *See* 20 U.S.C. § 107(b).

### 1.   The Javits-Wagner-O'Day Act

The Javits-Wagner-O'Day Act was enacted to promote economic opportunities for blind and significantly disabled persons by requiring entities of the federal government to procure certain products and services from qualifying nonprofit entities that employ blind and significantly disabled workers.  *See* 41 U.S.C. §§ 8501-8506. Pursuant to the statute, the U.S. AbilityOne Commission[1] establishes and maintains a

---

[1] The Javits-Wagner-O'Day Act established the Committee for Purchase From People Who Are Blind or Severely Disabled, which has been operating as the U.S. AbilityOne Commission since 2006.

procurement list of products and services offered by qualifying nonprofit agencies. Federal agencies must procure such goods and services from the listed nonprofit agency "if the product or service is available within the period required by the entity." *Id.* § 8504(a). Designated "central nonprofit agencies" facilitate the distribution of government orders for products and services on the procurement list among other qualified nonprofit agencies. *Id.* § 8503(c).

## 2. The Randolph-Sheppard Act

**a.** The Randolph-Sheppard Act, 20 U.S.C. §§ 107-107f, focuses on "enlarging the economic opportunities of the blind," *id.* § 107(a); *see also* 34 C.F.R. § 395.1-395.38. To help achieve this goal, the Act provides that blind individuals receive priority in "the operation of vending facilities" on federal property. 20 U.S.C. § 107(b). The Rehabilitation Services Administration within the Department of Education is "the principal agency for carrying out [the Randolph-Sheppard Act.]" *id.* § 107a(a)(1). The RSA contemplates that the Secretary of Education will promote the establishment of vending facilities on federal property. For example, it gives the Secretary the authority to "prescribe regulations designed to assure that . . . wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility . . . would not adversely affect the interests of the United States." *Id.* § 107(b)(2).

As relevant here, the statutory definition of vending facility includes "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment as the Secretary [of Education] may by regulation

prescribe as being necessary for the sale of articles or services described in section 107a(a)(5) of this title and which may be operated by blind licensees." 20 U.S.C. § 107e(7). Where the RSA applies, federal agencies do not negotiate directly with blind vendors. Instead, the Secretary of Education designates an agency in each State as the State Licensing Agency (SLA) for blind vendors in that State. *Id.* §§ 107a(a)(5), 107b. Federal agencies negotiate with the SLA for permits for the majority of the listed vending facilities, except cafeterias. For cafeterias, federal agencies issue a solicitation for proposals, and if the SLA is awarded the contract, the agency will contract with the State's SLA, which in turn selects a licensed blind vendor to perform the contract. *Id.* §§ 107a(a)(5), 107a(b).

If an SLA's proposal for a food-services contract is in the competitive range and ranks among the proposals with a reasonable chance of being selected, the RSA regulations give the SLA priority for the contract if the Department of Education determines, after consultation with the relevant federal agency, that the blind vendor can operate the cafeteria "at a reasonable cost, with food of a high quality comparable to that currently provided employees." 34 C.F.R. § 395.33(a); *see also id.* § 395.33(b). When the contract is for a large military cafeteria, such as the one at issue here, the usual practice is for the individual blind vendor holding the license for that facility to partner with a large food-service company that actually provides for the day-to-day performance of the contract.

**b.** Another provision of the RSA is also relevant here. The statute provides that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified." 20 U.S.C. § 107(b). A determination made by the Secretary pursuant to this provision is "binding" on the "department, agency, or instrumentality of the United States affected by such determination." *Id.* The district court referred to this provision as the "RSA Review Requirement," *see* 6.J.A. 2474, and it is referred to as such in this brief.

**c.** The RSA establishes its own scheme for dispute resolution. Disputes under the RSA are resolved by arbitration panels convened by the Department of Education, consisting of one individual designated by each party and a third individual jointly designated by the first two members from a list provided by the Department of Education. 20 U.S.C. §§ 107d-1, 107d-2. Arbitration panels may resolve disputes between vendors and SLAs and, as relevant here, between SLAs and federal agencies. An aggrieved SLA may file a complaint against an agency it believes is not in compliance with the RSA. *Id.* § 107d-1(b).

Congress provided that a decision by an arbitration panel shall be treated as a final agency action subject to judicial review under the Administrative Procedure Act (APA). 20 U.S.C. §§ 107d-1(b), 107d-2(a); *see also* 5 U.S.C. §§ 701-706. Although the Department is named as a defendant, to some extent "this is a legal fiction," because

"an arbitration panel is composed of members appointed by the parties to the arbitration, not of Department of Education officials," and the Secretary has no authority to review or reverse the panel's decision, even if she believes it was wrongly decided. *Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012) (citing 20 U.S.C. § 107d-2(a)).

### 3. The John Warner National Defense Authorization Act of 2007

Because both the RSA and the Javits-Wagner-O'Day Act address procurement of certain goods and services by federal agencies, there has been debate over the implementation of the two statutory schemes. *See, e.g.*, *NISH v. Cohen*, 247 F.3d 197, 199 (4th Cir. 2001). In 2006, Congress enacted a "no-poaching" provision in the John Warner National Defense Authorization Act of 2007 (NDAA) in order to address the applicability of the RSA and the Javits-Wagner-O'Day Act to military dining contracts. *See* Pub. L. No. 109-364, § 856, 120 Stat. 2083, 2347-49 (2006). The no-poaching provision specified that the RSA would not apply to "full food services, mess attendant services, or services supporting the operation of a military dining facility" that were on the Javits-Wagner-O'Day procurement list at the time of the provision's enactment. *Id.* at 2347. Similarly, the provision also specified that the Javits-Wagner-O'Day Act would not apply to "any contract entered into by the Department of Defense as of the date of the enactment of [the statute] with a State licensing agency under the Randolph-Sheppard Act . . . for the operation of a military dining facility." *Id.*

## B.    Factual Background

**1.**  The Army operates an active-duty military installation at Fort Riley, Kansas. Army dining facilities, including those at Fort Riley, follow one of two models: contractor-operated or military-operated.  Where the cafeteria is contractor-operated, the Army enters into what is called a Full Food Services contract, under which the contractor is responsible for all "activities that comprise the full operation of an Army dining facility," including the "requisitioning, receiving, storing, preparing, and serving of food," as well as "the performance of related administrative . . . functions," 1.J.A. 148 (Army Regulation 30-22, *Army Food Program*, 58 (July 24, 2012)), which may include management operations, headcount and cashier services, and menu planning.  In addition, a Full Food Services contract includes "custodial[] and sanitation functions" attendant to the operation of the dining facility.  *Id.*

In the second model, the Army itself operates the dining facility, and military personnel provide the food preparation and service functions, including requisitioning, receiving, storing, preparing, and serving food, as well as headcount and payment services, and other administrative functions.  *See, e.g.*, 1.J.A. 244, 294.  Army regulations prohibit soldiers from "perform[ing] [DFA] functions and/or duties on a regularly detailed basis without prior approval" from Headquarters, Department of the Army. Army Reg. 30-22, *Army Food Program*, 23 (¶ 3-42(c)(2)) (July 24, 2012), https://go.usa.gov/xySdE.  At Army facilities, DFA services include "[t]hose activities required to perform janitorial and custodial duties within dining facilities," including

10

"sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions." 1.J.A. 147-48 (Army Reg. 30-22, at 57-58). Thus, when Army personnel operate a dining facility, the Army enters into a DFA contract limited to DFA services. As a practical matter, these contracts generally cover services that soldiers do not perform under the above regulation, and, as a result, across Army dining facilities, they are for janitorial and custodial duties, even though individual contracts may include a few ancillary contractor responsibilities. In recent years, the Army has made an effort to standardize the DFA contracts across facilities. *See* 1.J.A. 288 n.1.

**2.** The Kansas Department for Children and Families is the Randolph-Sheppard Act State Licensing Agency for Kansas. 1.J.A. 287. Prior to August 2015, the Army relied on a Full Food Services contract for its dining facilities at Fort Riley. 1.J.A. 34-35 (Compl. ¶¶ 64-65). There is no dispute that military dining facilities are vending facilities within the meaning of the RSA and that Full Food Services contracts are subject to the Randolph-Sheppard Act. *See Cohen*, 247 F.3d at 203. As a result, The Kansas Department for Children and Families, in its role as the Kansas SLA, held the contract until 2015. 1.J.A. 34-35. Starting in 2012, the Army determined that Army personnel would take over most of the food preparation, and the Army would need the contractor to supply only DFA services with limited food preparation. 1.J.A. 288.

In 2015, in light of the number of military personnel at Fort Riley redeployed from Iraq and Afghanistan, *see* 1.J.A. 35 (Compl. ¶ 66), Fort Riley commanders

determined that soldiers would operate the dining facilities, including all food preparation and management functions, and solicited a DFA services contract for limited custodial and janitorial services, 1.J.A. 288. The Army provided that the new DFA contract would be for "janitorial and custodial duties within dining facilities," including "cleaning, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation related functions." 6.J.A. 2477-78; *see also* 4.J.A. 1461.

Because the DFA services contract was for janitorial and custodial services only, the Army did not solicit the contract pursuant to the RSA. 1.J.A. 35 (Compl. ¶ 67). Instead, the Army sought to secure a vendor pursuant to the Javits-Wagner-O'Day Act and began the process of acquiring the necessary services through AbilityOne's Procurement List. *Id.* SourceAmerica—one of the plaintiffs in this case—is designated as a "central nonprofit agency" under that Act. *See* 1.J.A. 21 (Compl. ¶ 3). Lakeview, another plaintiff, is a nonprofit agency that provides employment opportunities for individuals with significant disabilities through Javits-Wagner-O'Day Act procurement contracts. *See id.* (Compl. ¶ 2). In July 2015, AbilityOne published in the Federal Register a proposal by Lakeview in which Lakeview offered to act as the "Mandatory Source of Supply" for the DFA services, and Lakeview was selected to perform the services in January 2016. 1.J.A. 120 (Compl. Ex. E); 1.J.A. 153 (Compl. Ex. K). SourceAmerica, in its role as the statutorily prescribed "central nonprofit agency" under

the AbilityOne Program, facilitated the distribution of contracts to Lakeview. 1.J.A. 21 (Compl. ¶ 3).

## C. Arbitration Proceedings

Before the Army finalized the contract award, Kansas formally requested that the Department of Education convene arbitration proceedings under the RSA, alleging that the solicitation for DFA services at Fort Riley was "in violation of the Randolph-Sheppard Act." 1.J.A. 157 (Compl. Ex. L).[2] Kansas also claimed that the solicitation was "in violation of the No Poaching Provisions of the John Warner National Defense Authorization Act of 2007." 1.J.A. 157-58.

In response to this request, the Department of Education convened an arbitration panel to address "whether the [Army] has violated the [RSA] by failing to include the Randolph-Sheppard priority in the solicitation for DFA services at Fort Riley," and "whether the proposed inclusion of DFA Services to the [AbilityOne] procurement list would violate the no-poaching provisions of the John Warner National Defense Authorization Act of 2007." 1.J.A. 219 (Compl. Ex. O at 2). SourceAmerica

---

[2] On the same day, Kansas filed suit in the United States District Court for the District of Kansas, seeking to enjoin the Army from awarding the new contract for DFA services to Lakeview pursuant to the Javits-Wagner-O'Day Act during the pendency of arbitration. *See Kansas Dep't for Children & Families v. United States*, No. 15-cv-4907, 2016 WL 3129397 (D. Kan. Feb. 26, 2016). The district court granted a preliminary injunction pending the outcome of the arbitration proceeding. *Id.* at *3. The Tenth Circuit affirmed. *See Kansas ex rel. Kansas Dep't for Children & Families v. SourceAmerica*, 874 F.3d 1226 (10th Cir. 2017). The preliminary injunction was dissolved at the conclusion of the arbitration proceedings. *Id.* at 1252 ("[T]he arbitration panel has since issued its decision thereby dissolving [the district court] injunction . . . .").

and Lakeview unsuccessfully sought to intervene before the arbitration panel.  1.J.A. 39 (Compl. ¶ 80); *see also* 1.J.A. 226 (Compl. Ex. Q at 1).

The arbitration panel concluded that DFA services at Fort Riley are subject to the Randolph-Sheppard Act and that the Army violated the Act when it did not solicit the contract under the RSA.  1.J.A. 314-15 (Compl. Ex. V at 30-31).  In addition, the panel found that the Army violated the NDAA no-poaching provisions when it relied on the Javits-Wagner-O'Day Act in its procurement process.  *Id.*  The panel also concluded that the Army violated the RSA Review Requirement when it failed to seek advance review by the Secretary of Education of its decision to transition dining services at Fort Riley from a Full Food Services contract to a DFA services contract to support military personnel preparing and serving the food.  *Id.*  Brigadier General David P. Carey (Ret.) dissented, arguing that the Randolph-Sheppard Act does not apply to contracts for DFA services.  *See* 1.J.A. 318-40 (Compl. Ex. W).

### D.    District Court Proceedings

**1.**  In August 2017, plaintiffs SourceAmerica and Lakeview filed this suit in the U.S. District Court for the Eastern District of Virginia, naming the U.S. Departments of Education, Defense, and the Army, and the Secretaries of Education, Defense, and the Army as defendants.  Plaintiffs sought judicial review of the arbitration decision under the APA, 5 U.S.C. §§ 551-559, 701-706.  1.J.A. 20, 23.  Kansas, by and through the State Licensing Agency, intervened in order to defend the arbitration decision.  6.J.A. 2266-67.

The federal government defendants agreed with plaintiffs that the arbitration decision was wrongly decided because the Randolph-Sheppard Act does not cover Army contracts for DFA services. *See* 6.J.A. 2353. The government also argued that the Army's decision to switch to a DFA services contract did not trigger the RSA Review Requirement. *See* 6.J.A. 2358.

Kansas argued that the Randolph-Sheppard Act encompasses both Full Food Services contracts and DFA services contracts. *See* Dkt. No. 76, at 5-6. In making this argument, Kansas relied on a March 2018 letter from Secretary of Education Betsy DeVos to Representative Pete Sessions, which references Full Food Services contracts and DFA services contracts, arguing that the letter demonstrated that the Department of Education had adopted the view that both types of contracts are covered by the RSA. Dkt. No. 46 & Ex. A; *see also* Dkt. No 69-1, at 10-11. The federal government defendants responded that the Department of Education had not adopted a position on the application of the RSA to the DFA services contract at Fort Riley, apart from the position taken before the district court in litigation. *See* 6.J.A. 2463, 2467.

**2.** On March 15, 2019, the district court partially granted and partially denied each of the parties' motions for summary judgment. 6.J.A. 2508. The court held that the Randolph-Sheppard Act does not apply to the Fort Riley DFA contract because that contract is only for "ancillary services," and thus does not constitute the "operation of a vending facility" as required by the Randolph-Sheppard Act. 6.J.A. 2491. After supplemental briefing on the March 2018 letter, the court also rejected Kansas's reliance

on the letter and concluded that it was not "entitled to deference nor does it represent the [Department of Education's] position with respect to this litigation or the Fort Riley DFA contract generally." 6.J.A. 2496. The court also set aside the panel's finding that the Army violated the NDAA no-poaching provision as "not in accordance with law." 6.J.A. 2498.

The district court upheld, however, the arbitration panel's finding that the Army violated the Randolph-Sheppard Act by failing to comply with the Review Requirement set forth in 20 U.S.C. § 107(b). 6.J.A. 2497. The court reasoned that the Review Requirement obligated the Army to justify its decision to rely on soldiers, rather than on a Full Food Services contractor at Fort Riley, to the Secretary of Education. *Id.*

On April 22, 2019, Kansas filed a notice of appeal. *See* 6.J.A. 2514. The government filed a notice of cross-appeal on May 13, 2019. *See* 6.J.A. 2516.

## SUMMARY OF ARGUMENT

**1.** The Randolph-Sheppard Act provides that federal agencies will give blind vendors priority in the "operation of vending facilities." 20 U.S.C. § 107(b). The DFA services contract at Fort Riley at issue in this case, which covers custodial and janitorial services at the Army cafeterias there, is not for the "operation" of the dining facilities. The district court correctly concluded that such a contract was not within the purview of the RSA.

Army DFA services contracts like the one at issue here—which are limited to custodial and janitorial tasks—are, as the district court concluded, outside the scope of

16

the RSA. Under Army food program regulations, Army dining facilities operate under one of two models: contractor-operated or military-operated. Where a dining facility is contractor-operated and the contractor is responsible for all "activities that comprise the full operation of an Army dining facility," 1.J.A. 149 (Army Regulation 30-22, *Army Food Program*, 58 (July 24, 2012)), including food services and preparation, ordering and menu planning, and managerial and administrative functions, like headcount and cashier services, the contractor can be said to "operate" the facility within the meaning of the RSA. It is undisputed that such contracts are solicited under the RSA.

When the Army itself operates a dining facility, military personnel perform all the overall managerial functions, headcount and cashier services, menu planning, and preparation and service of food. *See* 1.J.A. 244, 294. In such cases, a contractor provides limited support pursuant to a DFA services contract for those custodial and janitorial services that soldiers by regulation cannot perform without "prior approval" from Army Headquarters. *See* Army Reg. 30-22, 23 (¶ 3-42(c)(2)), https://go.usa.gov/xySdE. Plainly, a contractor for DFA services is not responsible for the "operation" of the dining facility; Army personnel operate the cafeteria with strictly limited contractor support.

The RSA, as well as the implementing regulations, clearly contemplates that the operation of a cafeteria would include providing food, not merely "ancillary services in support of the operation of a vending facility." 6.J.A. 2491. The Supreme Court has, in another statutory context, explained that the "ordinary or natural meaning" of the

term "operate" is to "conduct the affairs of" or "manage." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). The district court correctly rejected the interpretation urged by Kansas that the RSA extends to any vendor who is providing a service "without which the cafeteria[] would not be able to function," 6.J.A. 2495, which rests on an interpretation that has no limiting principle, and cannot be squared with the statute.

Kansas has identified no special characteristics that would bring the contract at issue here—for limited custodial and janitorial services—within the scope of the RSA. The district court noted that the solicitation included tasks such as "cleaning, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation related functions." 6.J.A. 2477-78; *see also* 4.J.A. 1461. These limited services do not provide for the requisitioning of, preparation of, or serving of food, or any managerial or administrative functions, and cannot plausibly be thought to constitute the "operation" of the dining facility.

Kansas instead urges that the district court should have given deference to a March 2018 letter from Secretary DeVos to Representative Pete Sessions that it claims interprets the RSA to cover the contract at issue here. *See* 6.J.A. 2261-62. But Kansas's reliance on the letter is mistaken in several respects. First, the letter from the Secretary to a single Member of Congress does not constitute a binding agency interpretation that is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). The Secretary has not exercised her statutory rulemaking authority to address whether the RSA applies to DFA services contracts. *See United*

*States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (explaining that an agency interpretation of a statute is entitled to *Chevron* deference only if it is promulgated in a manner that Congress would have intended to have binding effect).

Kansas suggests in the alternative that the letter is entitled to lesser deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). But there is also no basis for this Court to grant the letter any deference even under the "modest" *Skidmore* standard. *Sierra Club v. U.S. Army Corps of Eng'rs.*, 909 F.3d 635, 643 (4th Cir. 2018). As discussed, the RSA is not ambiguous with regard to the meaning of the term "operate" as applied to Army DFA services contracts. Even assuming the statute were ambiguous, however, Kansas's reliance would be misplaced. The letter is not the type of agency statement to which a court may accord deference. This is not a typical APA case. The Secretary's letter is not an opinion letter to the public or internal agency guidance to future arbitration panels. Nor is it a response to a formal inquiry from Congress, and it would be incongruous to accord deference to a letter sent to a single Member of Congress. *Cf. Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000).

The letter also does not carry the "power to persuade" a court of the position urged by Kansas. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 288 (4th Cir. 2018) (explaining deference under *Skidmore* may be accorded where an agency interpretation has the "power to persuade, if lacking power to control"). The letter explains that "[t]he term 'operation' in the Act means that the vendor must 'manage' or 'direct the working of' the cafeteria," and acknowledges that "[s]ome contracts may be limited to discrete

19

tasks so as not to entail overall 'operation' of the cafeteria." 6.J.A. 2261. Although the letter states that RSA priority applies where "a vendor is responsible for all the functions of the cafeteria aside from those performed by military personnel," *id.*, it is focused on Department of Defense cafeteria contracts across the various service branches and does not address the extremely limited nature of the services provided under the Army DFA services contract at Fort Riley. It does not support Kansas's broad conclusion that any contractor supplying any task "instrumental," Br. 31, or "necessary," Br 19, to the operation of a cafeteria is engaged in the "operation of [a] vending facilit[y]," 20 U.S.C. § 107(b).

Kansas urges that, in the letter, the Secretary adopts the view of the arbitration panel below. But the government has made clear that, because she does not review, affirm, or reverse any individual panel decision, *Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012) (citing 20 U.S.C. § 107d-2(a)), the Secretary takes no position on the panel decision here, or in any other case, *see* 6.J.A. 2463, 2467. To the extent Kansas urges this Court to construe the letter as adopting the view that the RSA applies to any contract that includes tasks that are an "integral element" of a cafeteria functioning, that view is contrary to the statute for the reasons outlined in this brief, and should be accorded no deference.

Finally, the district court correctly concluded that the arbitration panel erred when it found that the Army had violated the no-poaching provisions of the NDAA. Kansas has not pressed this argument on appeal and it is thus waived, but in any event,

the district court's conclusion was correct. The no-poaching provision "did not expand the reach of the RSA," 6.J.A. 2499, and should not be read to support an atextual inference that the RSA covers contracts for "services supporting the operation of a military dining facility," Pub. L. No. 109-364, § 856, 120 Stat. 2083, 2347 (2006).

**2.** The district court erred when it concluded that the Army's decision to employ its own soldiers in the dining facilities at Fort Riley supported by the DFA services contract at issue here, rather than rely on a contractor through a Full Food Services contract, violated the RSA's Review Requirement. *See* 6.J.A. 2498-2501. The Review Requirement, which provides that "[a]ny limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary," 20 U.S.C. § 107(b), does not encompass the kind of decision at issue here. The provision, which must be read in conjunction with subsection 107(b)(2)'s grant of authority to the Secretary to ensure "wherever feasible, one or more vending facilities are established on all Federal property," *id.* § 107(b)(2), focuses on promoting inclusion of vending facilities on federal properties, not on, for example, determining the Army's requirements for its contracts based on mission needs.

The provision does not, by its terms, apply to changes in the use of military personnel that have a downstream effect of eliminating an opportunity for an RSA vendor. Instead, it applies to "arbitrary and harmful limitations on blind vendor operations," including limiting the kinds of merchandise a vendor was permitted to sell,

restricting the physical locations of vending facilities, and limiting the amount of income that vendors could accrue. S. Rep. No. 93-937, at 16 (1974). For example, the Eighth Circuit applied the provision to an attempt by the Department of Veterans Affairs to charge commissions on blind vendors' sales. *See Minnesota Dep't of Jobs & Training v. Riley*, 18 F.3d 606, 609 (8th Cir. 1994).

It is not a limitation on the operation or placement of a vending facility for the military to make a decision about troop deployment that furthers its mission even if that decision results in a need to restructure its dining facility contracts from a Full Food Services Contract to a model where military personnel conduct the majority of the dining facilities' functions supported by a contract for custodial and janitorial services. Because it is not such a limitation, there is no basis for the Army to have made a finding that the continued operation of the vending facility under a Full Food Services contract is adverse to the interests of the United States of the kind contemplated by the Review Requirement. This reading is consistent with the legislative history and the interpretation adopted by at least one other court of appeals. Congress certainly intended that the RSA would increase contracting opportunities for blind vendors on federal property, but it did not intend the anomalous result of inserting the Secretary of Education into the Army's decisionmaking about how to deploy its own soldiers. As the district court recognized, such an outcome is "puzzling." 6.J.A. 2497 n.21. This Court should conclude the provision is thus inapplicable here and reverse the district court decision.

## STANDARD OF REVIEW

This Court reviews de novo the district court's grant of summary judgment.

*Scott v. United States*, 328 F.3d 132, 137 (4th Cir. 2003).

## ARGUMENT

**I.     The District Court Correctly Concluded That Army Contracts For Dining Facility Attendant Services At Fort Riley Are Not Covered By The RSA.**

> **A.     Army DFA Services Contracts For Janitorial And Custodial Services Are Not For The Operation Of A Vending Facility And Thus, Are Not Subject To The RSA.**

The Randolph-Sheppard Act provides that in order to "provid[e] blind persons with remunerative employment," "blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities" on federal property. 20 U.S.C. § 107(a). The statutory definition of "vending facilit[ies]" includes "automatic vending machines, cafeterias, snack bars, cart services, shelters, [and] counters." *Id.* § 107e(7). It is undisputed that the military cafeterias at issue here are vending facilities within the meaning of the statute. *See NISH v. Cohen*, 247 F.3d 197, 199 (4th Cir. 2001).

This case instead turns on what it means to "operate" such a facility for purposes of applying RSA priority. The district court correctly concluded (6.J.A. 2491) that the Army DFA services contractor at Fort Riley—who provides limited custodial and janitorial services—is not engaged in the "operation of vending facilities" and thus, does not receive priority under the RSA. 20 U.S.C. § 107(b). The district court's interpretation of the RSA—that a vendor who provides limited custodial and janitorial

23

services, such as those covered by the contract at issue here and others like it, cannot be said to "operate" a cafeteria—is consistent with Supreme Court precedent, the ordinary understanding of what it means to operate a vending facility, and other provisions of the RSA and its implementing regulations.

The Army employs two models for its dining facilities: military-operated and contractor-operated. As explained above, the Army solicits contracts for contractor-operated facilities as Full Food Services contracts, and it is undisputed that such contracts qualify for RSA priority. Under a Full Food Services contract, the contractor is responsible for all "activities that comprise the full operation of an Army dining facility," including the "requisitioning, receiving, storing, preparing, and serving of food," as well as "the performance of related administrative, custodial, and sanitation functions." 1.J.A. 148 (Army Regulation 30-22, *Army Food Program*, 58 (July 24, 2012)). The Army regulations thus explicitly provide that the contractor will "operat[e]" the dining facility. *Id.*

Under the second model, the Army itself assumes responsibility for operation of the dining facility, and military personnel are responsible for performing management operations, headcount and cashier services, menu planning, requisitioning of food, and preparing and serving food. *See, e.g.*, 1.J.A. 244, 294. A contractor provides only limited support through a DFA services contract. Contracts for DFA services are generally limited to "[t]hose activities required to perform janitorial and custodial duties within dining facilities," such as "sweeping, mopping, scrubbing, trash removal, dishwashing,

waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions." 1.J.A. 147-48 (Army Reg. 30-22, at 57-58). In contrast to a Full Food Services contract, an Army DFA services contractor is not "operat[ing] [a] vending facilit[y]," 20 U.S.C. § 107(b), but is only providing limited support services "*within* dining facilities," 1.J.A. 148 (emphasis added).[3]

As the district court correctly recognized, "[t]he plain language of the RSA makes clear that its preference applies only where the vendor exercises control or management over the functioning of the vending facility," and, thus, "does not apply to the Fort Riley DFA contract." 6.J.A. 2492. This conclusion accords with the "ordinary or natural meaning" of the term "operate." *United States v. Bestfoods*, 524 U.S. 51, 66 (1998). In *Bestfoods*, the Supreme Court explained that the "ordinary or natural meaning" of the term "operate" in the "mechanical sense" is "[t]o control the functioning of; run: operate a sewing machine," and in the "organizational sense . . . [is] '[t]o conduct the affairs of; manage: operate a business.'" *Id.* (quoting *American Heritage Dictionary* 1268

---

[3] Not all components of the Department of Defense rely on this binary model of cafeteria operation, nor has the Army always followed this model. As a result, other service branches may rely on military personnel to perform some duties, but also employ support-services contracts that do incorporate food service and preparation responsibilities, or supervisory and administrative responsibilities beyond those at issue here. In these other contexts, such contracts may also be labeled as dining facility attendant contracts or mess attendant contracts. This Court need not address whether other support-services contracts that cover less than a Full Food Services contract would fall within the purview of the RSA to conclude that the Army DFA contract at issue here and those like it, which are limited to custodial and janitorial services, fall outside the scope of the RSA.

(3d ed. 1992); *Webster's New International Dictionary* 1707 (2d ed. 1958)) (emphases omitted); *see also Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (explaining that a RICO "'operation or management' test" requires that an individual take "some part in directing the enterprise's affairs" (emphasis omitted)). In the context of the RSA, the statute refers to "the operation of vending facilities," 20 U.S.C. § 107(b), and "operation of cafeterias," *id.* § 107d-3(e). For the statute to be applicable, the thing controlled or managed by the contractor must be the vending facility or cafeteria itself; the performance of limited custodial and janitorial services within the facility is "insufficient to trigger the RSA's preference, which applies by its terms only to 'the operation of vending facilities.'" 6.J.A. 2492 (quoting 20 U.S.C. § 107(b)).

This understanding of the meaning of "operate" is consistent with other uses of the terms "operation" and "operating" through the RSA. *See IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005) (It is a "normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning."). For example, Section 107a(d) provides for review by the Secretary to evaluate whether new or renovated federal property includes "*satisfactory . . . sites for* the location and *operation of a vending facility* by a blind person," 20 U.S.C. § 107a(d)(1) (emphases added), but creates an exception where, among other requirements, the "*operation of such a vending facility by a blind person* would be in proximate and substantial direct competition" with an incumbent "restaurant or other food facility," *id.* § 107a(d)(2)(B)(ii) (emphasis added); *see also id.* § 107a(d)(3) (providing that a

"satisfactory site" means "an area determined by the Secretary to have *sufficient space, electrical and plumbing outlets, and such other facilities* as the Secretary may by regulation prescribe, for the location and *operation of a vending facility* by a blind person") (emphases added). These other uses of the terms "operate" or "operation" also indicate the vendor will "exercise control or management over the functioning of the vending facility," 6.J.A. 2492, and not merely contribute a limited set of support services to an existing facility. Thus, the district court correctly rejected the arbitration panel's conclusion that it is sufficient that a contract include "tasks that constitute an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria, or tasks that without which the cafeterias would not be able to function" because such a contract does not constitute the operation of a vending facility. 6.J.A. 2494-95 (quoting 1.J.A. 315 (Final Arbitration Decision)).

Other courts to have considered the question have also concluded that the RSA's use of the term "operate" has its "ordinary, established meaning[]," which "[t]he Oxford English Dictionary defines . . . in the relevant sense, as '[t]o direct the working of; manage; conduct, work (a railway, business, etc.).'" *Mississippi Dep't of Rehab. Servs. v. United States*, 61 Fed. Cl. 20, 26 (2004); *see also, e.g.*, *Washington State Dep't of Servs. for the Blind v. United States*, 58 Fed. Cl. 781, 789 (2003) ("'To operate' is used in 20 U.S.C. § 107(a) as a transitive verb ('to operate vending facilities'). When used as a transitive verb, 'to operate' has distinctive meanings: '1. To control the functioning of; run . . . 2. To conduct the affairs of; manage . . . .' The phrase 'to operate vending facilities' in

20 U.S.C. § 107(a) therefore connotes a distinctly executive function." (ellipses in original) (citation omitted)) (quoting *American Heritage Dictionary* 1233 (4th ed. 2000))); Mem. Ruling, *Louisiana Office of Rehab. Servs. v. United States Dep't of the Air Force*, No. 98-cv-1392, at *7 (W.D. La. Mar. 29, 2000) (holding that the military, not the vendor, would operate the cafeteria where the military "(1) controlled the food cost, (2) controlled the food quality, and (3) was responsible for day-to-day supervision of the cafeteria").

The district court's conclusion that Army DFA services contracts for limited custodial and janitorial services are not within the RSA is also supported by the explicit contemplation of the statute and its implementing regulations that the operation of a dining facility will include the provision of food. It is an explicit condition that an SLA should receive priority under the RSA for the operation of a cafeteria where the determination is made "that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided." 20 U.S.C. § 107d-3(e); *see also* 34 C.F.R. § 395.33(a), (d) (same). Under an Army DFA contract like the one at issue here, there is no need to consider the contractor's provision of food, since that is not part of the contractor's responsibilities under the terms of the contract. Because Army DFA services contracts do not include any food preparation or food service tasks, or any of the administrative and managerial functions necessary "[t]o control the functioning of" or "conduct the affairs of" the vending facility, *Bestfoods*, 524 U.S. at 66 (alteration in original), they cannot be said to be for the "operation of vending facilities," 20 U.S.C. § 107(b).

**B. Kansas Has Identified No Respect In Which The Army DFA Contract At Issue Here Would Be Within The Scope Of The RSA.**

Even assuming the RSA could apply in some cases where the contractor manages less than a whole facility, Kansas has not provided any basis to conclude the RSA should apply here, where the services performed by the contractor do not include the preparation, sale, or service of food or other items, or any administrative or managerial functions for the entire facility. Kansas offers no evidence that the Army DFA services contract at issue here would require any management or control over the facility, only that the contract falls within the RSA because it includes the provision of "some of the services necessary and integral for the operation of the dining facility." Br. 29.

Kansas argues (Br. 28-29) that the statute does not specify that a vendor must operate the entire facility, and it notes that the military always retains some level of control over the facility—even under a Full Food Services contract. This is not a case, however, in which a contractor plays a substantial role in providing food services or in which the Army exerts only some nominal form of control. The Army personnel at Fort Riley are engaged in all of the food service and preparation, and managerial and administrative functions of the cafeteria, 1.J.A. 244, and the contract at issue here covers only limited custodial and janitorial services such as "cleaning, sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation related functions," 4.J.A. 1461 (Performance Work Statement); *see also* 4.J.A. 1465-68 (detailing specific "janitorial duties and

sanitation duties" within scope of contract). Kansas disregards the district court's recognition that "operation" of a vending facility implicates the "management" of the facility. And, its reasoning potentially extends to the provider of any service without which a cafeteria cannot function.

Under Kansas's reading, even a contract that covered only trash removal would be a contract for "operation" of the dining facility, as would a separate contract for cleaning dinnerware and trays. Such an understanding could potentially bring within the scope of the RSA contracts for many kinds of support services that are ancillary to the operation of a cafeteria but nonetheless necessary to its overall functioning, including food-supply contracts, furniture-supply contracts, plumbing, electricity, and other building maintenance services. Congress surely did not intend for the RSA to apply to, for example, a vendor who replaces lightbulbs or supplies canned goods for a cafeteria on the theory that such vendor is "operating" the facility.

Kansas also relies (Br. 30-31) on the fact that (1) the solicitation required that any bid include an onsite project manager with "experience in managing cafeteria style or multi-entrée operations providing complete meal service," 4.J.A. 1463; and, (2) that the contractor's employees would be required to complete training applicable to "food employees," 2.J.A. 727. Neither of these requirements renders the contract for the operation of the vending facility.

Nothing in the contract solicitation indicates that the contractor will cover any meal service despite the managerial experience requirement. In fact, the opposite is

true. It is undisputed that the DFA contractor here will have no role in preparation or service of food. *See* 4.J.A. 1465-68 (detailing contractor performance responsibilities including cleaning and sanitizing of equipment, utensils, surfaces, and dining facility exterior areas). Moreover, the testimony on which Kansas relies makes clear that food employee training is required of any "individual working with . . . food equipment or utensils, or food contact services." 2.J.A. 725. As the Performance Work Statement outlines, the DFA contractor here is responsible for a number of custodial and janitorial services that will put its employees in contact with food equipment and utensils, but only insofar as they are responsible for cleaning them. *See* 4.J.A. 1465-68. There is no basis to conclude that because the employees must undergo training required of food employees, the DFA services contractor here is "operating" the cafeteria.

That the custodial and janitorial services provided under an Army DFA contract do not constitute the "operation" of the facility is underscored by comparison to the responsibilities of the Army at the Fort Riley facilities in question. These include management operations, headcount and cashier services, cooking, menu planning, and serving food. 1.J.A. 244, 294. And that conclusion is further underscored by comparison to the role of a Full Food Services contractor, which performs all "activities that *comprise the full operation* of an Army dining facility," including the "requisitioning, receiving, storing, preparing, and serving of food," as well as "the performance of related administrative, custodial, and sanitation functions." 1.J.A. 148 (Army Reg. 30-22, at 58) (emphasis added). A contractor performing the limited custodial and

sanitation functions involved in the DFA contract here can in no sense be said "[t]o control the functioning of," or to "conduct the affairs of," the vending facility. *Bestfoods*, 524 U.S. at 66 (alteration in original).

### C. The Secretary's March 2018 Letter Should Be Accorded No Deference.

Kansas's primary argument (Br. 19-28) is that the district court's decision should be reversed for failing to afford deference to a March 2018 letter from Secretary Betsy DeVos to Representative Pete Sessions. *See* 6.J.A. 2261-62. But the district court correctly concluded that an interpretation of a statute stated in a letter from the Secretary to a Member of Congress does not constitute a binding agency interpretation that is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). *See* 6.J.A. 2495-96 & n.20 ("Intervenor cannot credibly argue that a letter written by the Secretary to a congressman constitutes an agency interpretation promulgated in the exercise of the authority to make rules carrying the force of law."); *see also United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001) (explaining that an agency interpretation of a statute is entitled to *Chevron* deference only if it is promulgated in a manner that Congress would have intended to have binding effect); *Knox Creek Coal Corp. v. Secretary of Labor*, 811 F.3d 148, 159-60 (4th Cir. 2016) (holding that statements made by the Secretary of Labor in litigation were not entitled to *Chevron* deference in part because they were not "binding or precedential" and were not adopted through a "formal procedure").

Nothing in this Court or the Tenth Circuit's case law is to the contrary. *See Cohen*, 247 F.3d at 201-02; *NISH v. Rumsfeld*, 348 F.3d 1263 (10th Cir. 2003). In both cases, the question before the court was whether the definition of "cafeterias" promulgated in the Department of Education's regulations included military dining facilities, and as this Court and the Tenth Circuit recognized, a regulation is the kind of "agency determination that is entitled to deference." *Cohen*, 247 F.3d at 202 (citing 34 C.F.R. § 395.1(d)); *see also Rumsfeld*, 348 F.3d at 1270 (granting *Chevron* deference to "the definition of 'cafeteria' promulgated" by the Department of Education in 34 C.F.R. § 395.1(d)). It is true that both this Court and the Tenth Circuit also considered a memorandum issued by the Commissioner of the Rehabilitation Services Administration on whether military cafeterias constituted vending facilities, but as the Tenth Circuit explained, such a memorandum was not owed deference under *Chevron*, but rather, to the extent "it constitute[d] an agency's interpretation of its own regulation," some deference was appropriate under *Auer v. Robbins*, 519 U.S. 452 (1997). *Rumsfeld*, 348 F.3d at 1270 (citing *Auer*, 519 U.S. at 461). The letter at issue before this Court is not an agency interpretation of its own regulation; it does not cite any Department of Education regulations, and there are no regulations that address directly the meaning of the term "operate" in the RSA.[4]

---

[4] For the same reasons, no deference should be afforded under *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (explaining that deference should be afforded to agency interpretations of regulations only where the "regulation is genuinely ambiguous").

Similarly, this Court in *NISH v. Cohen* gave no indication that it was awarding *Chevron* deference to the memorandum itself, but cited it for the proposition that the regulations in question were consistent with the Department's "position regarding the applicability of the [RSA] to military mess hall facilities." 247 F.3d at 205. As the district court correctly recognized, there is no basis for a court to accord deference to a letter sent from the Secretary to a single Member of Congress, which is not the kind of agency interpretation that "Congress would have intended, and expected, courts to treat . . . as within . . . its delegation to the agency of 'gap-filling' authority." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173 (2007) (emphasis omitted).

Kansas suggests in the alternative that the letter is entitled to lesser deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). But there is also no basis for this Court to grant the letter any deference even under the "modest" *Skidmore* standard. *Sierra Club v. U.S. Army Corps of Eng'rs.*, 909 F.3d 635, 643 (4th Cir. 2018). For the reasons discussed, the statute is not ambiguous with regard to the meaning of the term "operate" as applied to the Army's DFA services contracts. Army personnel provide the supervisory functions and food services, including overall management operations, headcount and cashier services, cooking and menu planning, and serving food. By contrast, Army DFA services contractors provide limited custodial and janitorial support within dining facilities. *See* 1.J.A. 244, 291-94. The contract at issue here unambiguously does not fall within the "ordinary or natural meaning" of the term

"operate," *Bestfoods*, 524 U.S. at 66, especially in light of how the term is employed in the context of the statute, *see supra* pp. 23-28.

In any event, reference to the Secretary's letter would not be a proper basis for resolving an ambiguity, even if one existed. Where an agency interpretation does not constitute a binding agency interpretation that is entitled to deference under *Chevron*, it may be accorded "a lesser form of deference under *Skidmore*," but the degree of deference "'depend[s] upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 288 (4th Cir. 2018) (*Sierra Club*) (quoting *Skidmore*, 323 U.S. at 140) (first alteration in original).

The letter at issue here is not the type of agency statement to which a court may accord deference. This case is not a typical APA case. The Secretary has not exercised her statutory rulemaking authority to address whether the RSA applies to DFA services contracts. It would be incongruous to accord deference to a letter sent to a single Member of Congress; it is not an opinion letter issued to the public or internal agency guidance directed at future arbitration panels. Nor is it a response to a formal inquiry from Congress. *Cf. Christensen v. Harris County*, 529 U.S. 576, 586-88 (2000). Kansas has not identified any manner in which the letter outlined a long-held agency view "consisten[t] with earlier and later pronouncements." *Sierra Club*, 899 F.3d at 288.

And in any event, the Secretary's letter does not carry the "power to persuade" a court of the position adopted by the arbitration panel and advocated by Kansas. *Sierra Club*, 899 F.3d at 288. As an initial matter, Kansas errs in its understanding of the letter; it focuses on the letter's statement that a "vendor can be said to 'manage' the cafeteria, even if the vendor is not preparing food," Br. 27, because "the cafeteria would not be able to operate without the vendor," 6.J.A. 2261, but disregards that the letter also contemplates that such non-food preparation functions include not only sanitation-related functions, but also "*supervisory,* [and] *administrative* . . . functions," *id.*

Moreover, in making this statement about the vendor's management of the cafeteria, the letter focuses on Department of Defense contracts across the various service branches and does not address the extremely limited nature of the services provided under Army DFA service contracts, the fact that the contract here involves no administrative or managerial functions for the cafeteria, or the Army regulations that distinguish between DFA contracts and Full Food Service contracts. In addition, Kansas's understanding cannot be squared with the letter's statement that "[t]he term 'operation' in the Act means that the vendor must 'manage' or 'direct the working of' the cafeteria," 6.J.A. 2261 (quoting *Oxford English Dictionary* (2d ed. 1989)), and its acknowledgement that "[s]ome contracts may be limited to discrete tasks so as not to entail overall 'operation' of the cafeteria," *id.*

Finally, the Secretary's letter does not adopt the conclusion of the arbitration panel—that the solicitation here fell within the RSA because it "includes tasks that are

an integral element of providing food service at a military cafeteria facility, or pertain to the operations of a cafeteria, or tasks that without which the cafeterias would not be able to function." 1.J.A. 315. The Secretary made clear to the district court that the letter should not be read as an endorsement of the underlying arbitration panel's standard, and that the Department of Education takes no position, "apart from this litigation," regarding "the application of the Randolph-Sheppard Act to the dining facility attendant services at Fort Riley." 6.J.A. 2463, 2467. Because she does not review, affirm, or reverse any individual panel decision, *see Sauer v. U.S. Dep't of Educ.*, 668 F.3d 644, 650 (9th Cir. 2012) (citing 20 U.S.C. § 107d-2(a)), the Secretary takes no position on the panel decision in this case, or any other, *see, e.g.*, 6.J.A. 2467-68. To the extent Kansas urges this Court to construe the letter as adopting the view that the RSA applies to any contract that includes tasks that are an "integral element" of a cafeteria functioning, that view is contrary to the statute for the reasons outlined above, *see supra* pp. 23-28, and should be accorded no deference.

### D. The District Court Correctly Concluded That The Army Did Not Violate The No-Poaching Provisions Of The NDAA.

The district court correctly concluded that the arbitration panel erred when it found that the Army had violated the no-poaching provisions of the NDAA when it sought to secure the DFA services by placing them on the Javits-Wagner-O'Day procurement list. *See* 6.J.A. 2498-2501. Kansas has not pressed an argument on appeal that the district court's decision was incorrect and thus, any such argument is not

properly before this Court. *See United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

In any event, however, the district court's conclusion was correct. The no-poaching provision "did not expand the reach of the RSA," but instead "curtailed the reach of the RSA and the [Javits-Wagner-O'Day Act] in an attempt to avoid conflicts between" the two. 6.J.A. 2499. Nothing in the statute's directive that the RSA "does not apply to . . . services supporting the operation of a military dining facility that . . . were services on the [Javits-Wagner-O'Day] procurement list" at the time of the NDAA's enactment implies that the RSA applies to those services. Pub. L. No. 109-364, § 856, 120 Stat. 2083, 2347 (2006). The NDAA makes clear that services supporting the operation of military dining facilities that were on the procurement list at the time of the provision's enactment are not subject to the RSA. 6.J.A. 2500. It does not "include or invite the inference that all such services not on the [Javits-Wagner-O'Day Act] procurement list at the time are covered by the RSA." *Id.*

## II. The Army's Decision To Rely On A DFA Services Contract Did Not Violate The RSA's Review Requirement.

The district court erred in holding that the Army violated the Randolph-Sheppard Act when it restructured the Fort Riley contracts without justifying its decision to the Secretary of Education. *See* 6.J.A. 2497-98. The RSA Review Requirement grants the Secretary of Education the ability to consider "limitation[s] on

38

the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States." 20 U.S.C. § 107(b). The Army's decision to redeploy its troops to staff dining facilities at Fort Riley, and to secure a DFA services contract to support those troops, limited neither the "operation" nor "placement" of the Fort Riley facilities as is contemplated by the RSA. There was thus no basis for the Army to make a finding that the placement or operation of the vending facility would "adversely affect the interests of the United States" and no role for the Secretary of Education in the decision. *Id.* The district court erred when it concluded that such a decision is one that Congress contemplated would involve the Secretary of Education.

The plain language of Section 107(b) makes clear that the RSA Review Requirement does not apply to the Army's decision to redeploy its soldiers at Fort Riley and consequently, to restructure its contract solicitations. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999) (explaining that when the statutory language "provides a clear answer," the court's analysis "ends there"). Section 107(b) provides the Secretary of Education with authority to "prescribe regulations designed to assure that . . . (1) the priority under this subsection is given to [blind vendors]" and "(2) wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility . . . would not adversely affect the interests of the United States." 20 U.S.C. § 107(b). The statute also provides:

Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified . . .

*Id.*

The text of the Review Requirement focuses on promoting the inclusion of vending facilities on federal property, not on overseeing the decision by the Army on how best to employ its own soldiers or the consequential result of that decision on procurement processes. The Review Requirement does not apply in this case because the Army's decision to switch from a Full Food Services contract to a DFA services contract does not limit "the placement or operation" of vending facilities. The switch means that the Army will now be using soldiers, rather than an outside vendor, to perform most of the functions at the Fort Riley dining facilities and has the indirect effect of narrowing an RSA contracting opportunity. The statute, on the other hand, is intended to allow the Secretary of Education to prevent agencies from imposing direct restrictions on the placement or operation of vending facilities by, for example, limiting the kinds of merchandise a vendor was permitted to sell, restricting the physical locations of vending facilities, or limiting the amount of income that vendors could accrue.

In order to carry out its military mission, the Army must have the ability to make decisions about the deployment of soldiers, even if those decisions result in the need to switch from a Full Food Services contract to a facility where Army personnel carry out

the majority of the functions. There is no dispute that the Army has the authority to rely on its own soldiers to manage and staff the dining facilities at Fort Riley supported by a DFA services contractor. Kansas does not contend that it would violate the RSA for the Army to employ only soldiers in its dining facilities with the support of a DFA services contract. Indeed, Kansas has not challenged the Army's decision except insofar as it has argued that the DFA services contract should be considered subject to the RSA, and that it triggers the Review Requirement.

The language surrounding the Review Requirement further illustrates that the provision is not concerned with the military's decision to employ its own personnel in its dining facilities despite the potential consequences of that decision for an incumbent Full Food Services contractor. Subsection 107(b)(2), which directly precedes the Review Requirement, underscores the provision's concern with including vending facilities on federal property and illustrates that the review requirement does not apply to the military's decision at issue here. *See General Dynamics Land Sys. v. Cline*, 540 U.S. 581, 596 (2004) (explaining the general principle that statutory text "must be read in context [since] a phrase 'gathers meaning from the words around it'") (quoting *Jones v. United States*, 527 U.S. 373, 389 (1999)).

Subsection (2) provides the Secretary of Education with regulatory authority to ensure that "vending facilities are established on all Federal property" as long as it is "feasible" and does not "adversely affect the interests of the United States." 20 U.S.C. § 107(b)(2). In light of this context, the Review Requirement provides a backstop

through which the Secretary can ensure that federal agencies are not unnecessarily limiting the reach of the Randolph-Sheppard Act through unjustified findings that a vending facility's placement or operation would adversely affect the United States. *Id.* Together, the Review Requirement and the preceding subsection help guarantee the placement of vending facilities on federal properties, but nothing in either provision's text inserts the Secretary of Education into the Army's decisionmaking process regarding the redeployment of its own soldiers or the resulting modification of the procurement arrangements, even where that modification would have the indirect effect of eliminating an existing opportunity for an RSA vendor.

This conclusion is further supported by the legislative history of the RSA. The Senate Report on the 1974 amendments to the Randolph-Sheppard Act indicates that the purpose of the Review Requirement is to "assure the establishment of one or more blind vending facilities on all Federal property . . . except where such facilities would be adverse to the interests of the United States." *See* S. Rep. No. 93-937, at 15 (1974). Congress thus did not intend the provision to reach every decision by a federal agency that would impact the operation of a vending facility by a Randolph-Sheppard Act vendor.

The district court derived a different conclusion from the legislative history, stating that, in its view, the requirement was added because "[f]ederal agencies had not done all they could to insure the establishment and the maintenance of blind vendors on property under their control." 6.J.A. 2498 (quoting S. Rep. No. 93-937, at 16)

(emphasis omitted). The Senate Report specifically notes, however, that Congress had concern about federal agencies imposing "arbitrary and harmful limitations on blind vendor operations," including limiting the kinds of merchandise a vendor was permitted to sell, restricting the physical locations of vending facilities, and limiting the amount of income that vendors could accrue. S. Rep. No. 93-937, at 16.

This understanding of the Review Requirement has been adopted by at least one other court of appeals, which applied the provision to the kinds of limits on the location or operation of vending facilities referenced in the Senate Report, not to the kinds of agency decisions about use of Army personnel at issue in this case. *See Minnesota Dep't of Jobs & Training v. Riley*, 18 F.3d 606 (8th Cir. 1994); *Minnesota Dep't of Econ. Sec. v. Riley*, 107 F.3d 648 (8th Cir. 1997). The Eighth Circuit held that charging commissions on blind vendors' sales constituted a "limitation on the . . . operation of a vending facility" that implicated Section 107(b). *See Minnesota Dep't of Jobs & Training*, 18 F.3d at 609. As that court explained, Congress was particularly concerned with "federal agency abuses of blind vendor's operations, like forcing blind vendors to pay commissions." *Id.*

Similarly, in *Minnesota Department of Economic Security*, the Eighth Circuit concluded that attempts to "drive [a] blind vendor out of its domain" by conditioning permits to place RSA vending machines on an agreement that the federal agency could install competing vending machines constituted a "limitation" that must be approved by the Secretary. 107 F.3d at 650. The court noted that the federal agency had not challenged the district court's finding that "competing vending machines w[ould] . . . undermine

or . . . destroy [the] blind vendor's ability to obtain what is already a small income." *Id.* (ellipses and second alteration in original). That court reasoned that the condition limited the blind vendor's operation and therefore must be approved by the Secretary. *Id.*

Unlike the Army's decisions about troop deployment at Fort Riley and the resulting consequences for the incumbent RSA vendor, both of those cases involved direct restrictions on the manner in which blind vendors were permitted to operate their facilities. *See Minnesota Dep't of Econ. Sec.*, 107 F.3d at 650; *Minnesota Dep't of Jobs & Training*, 18 F.3d at 609. Neither involved the military's decision to restructure personnel or contracts in a manner that had a downstream effect on a RSA vendor. The district court erred when it applied the Review Requirement to the Army's decision to return to a model in which military personnel perform the majority of the functions of the facility, supported by a DFA services contract. This decision, unlike those before the Eighth Circuit, limited neither the "operation" nor the "placement" of a dining facility. 20 U.S.C. § 107(b). It is not the kind of direct limitation on hours, merchandise, location, or income of the RSA vendor that Congress intended to address in the Review Requirement.

Moreover, there is no basis to conclude that the Army should have made or did make a finding that the establishment or operation of a vending facility would "adversely affect the interests of the United States." 20 U.S.C. § 107(b). The Army decided to modify the contract structure for its dining facilities in response to the return

of soldiers from Iraq and Afghanistan. *See* 1.J.A. 35 (Compl. ¶ 66). The Army originally solicited the contract for dining facilities at Fort Riley as a Full Food Services contract in order to support its logistical functions while soldiers were deployed abroad. *See* 1.J.A. 34 (Compl. ¶ 62). When a large number of soldiers returned to Fort Riley in 2015, they were able to resume operating the Fort Riley dining facilities, making the contract for full food services unnecessary. 1.J.A. 35 (Compl. ¶ 66). There is no reason to conclude that Congress meant to involve the Secretary of Education in this mission-specific Army decision simply because it would have a downstream effect on the RSA vendor. The Army's choice to restructure the contract is a consequence of soldiers resuming more duties at the dining facilities—and Kansas has not suggested that the Army does not have the authority to make the decision about how best to deploy its soldiers. *See id.* Such a decision does not affect the physical location of the Fort Riley cafeterias and it does not place new restrictions on how those facilities may operate. The Review Requirement provision is thus inapplicable by its own terms.

Congress certainly intended that the RSA would increase contracting opportunities for blind vendors on federal property. But the district court's application of the Review Requirement to the decision at issue here—where the military is making a decision about how to employ its own personnel that has the indirect effect of narrowing contracting opportunities for blind vendors—reads the statute too broadly. The district court itself acknowledged that its interpretation of the statute would produce an anomalous result, noting that it was "puzzling that the RSA requires the

45

Army to justify to the Secretary of Education the Army's decision to use Army cooks in its dining facilities," 6.J.A. 2497 n.21, but failed to grapple with the implication that such an anomalous result suggests that the court's understanding of the provision was erroneous.

The consequence of the court's holding is especially problematic given that (1) it is undisputed that the Army has the authority to decide to employ military personnel in its dining facilities; and (2) soldiers performed the disputed duties in the dining facilities before deployment overseas. *See* 1.J.A. 35 (Compl. ¶ 66). Because the Secretary's judgment under the Review Requirement is binding, the district court's interpretation of Section 107(b) removes the decision about whether, and how, to employ soldiers on military property from the hands of the Army and places it instead in the hands of the Secretary of Education. *See* 6.J.A. 2497 & n.21. This cannot be what Congress intended when it enacted the Review Requirement. The district court's conclusion to the contrary must be reversed.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed in part, and reversed in part.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

G. ZACHARY TERWILLINGER
*United States Attorney*

MARK B. STERN
*/s/ Laura E. Myron*
LAURA E. MYRON
*Attorneys, Appellate Staff*
*Civil Division, Room 7228*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4819*
*laura.e.myron@usdoj.gov*

August 2019

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,226 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Laura E. Myron*
LAURA E. MYRON

**CERTIFICATE OF SERVICE**

I hereby certify that on August 14, 2019, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Laura E. Myron*

LAURA E. MYRON

# ADDENDUM

# TABLE OF CONTENTS

20 U.S.C. § 107................................................................................................ A1

20 U.S.C. § 107a(d).......................................................................................... A1

20 U.S.C. § 107d-3(e) ...................................................................................... A2

## 20 U.S.C. § 107. Operation of Vending Facilities

### (a) Authorization

For the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property.

### (b) Preferences regulations; justification for limitation on operation

In authorizing the operation of vending facilities on Federal property, priority shall be given to blind persons licensed by a State agency as provided in this chapter; and the Secretary, through the Commissioner, shall, after consultation with the Administrator of General Services and other heads of departments, agencies, or instrumentalities of the United States in control of the maintenance, operation, and protection of Federal property, prescribe regulations designed to assure that—

> (1) the priority under this subsection is given to such licensed blind persons (including assignment of vending machine income pursuant to section 107d-3 of this title to achieve and protect such priority), and

> (2) wherever feasible, one or more vending facilities are established on all Federal property to the extent that any such facility or facilities would not adversely affect the interests of the United States.

Any limitation on the placement or operation of a vending facility based on a finding that such placement or operation would adversely affect the interests of the United States shall be fully justified in writing to the Secretary, who shall determine whether such limitation is justified. A determination made by the Secretary pursuant to this provision shall be binding on any department, agency, or instrumentality of the United States affected by such determination. The Secretary shall publish such determination, along with supporting documentation, in the Federal Register.

## 20 U.S.C. § 107a. Federal and State Responsibilities

. . . .

### (d) Buildings Occupied by United States Departments, Agencies, and Instrumentalities Required to Provide Sites for Facilities; Exceptions

(1) After January 1, 1975, no department, agency, or instrumentality of the United States shall undertake to acquire by ownership, rent, lease, or to otherwise occupy, in whole or in part, any building unless, after consultation

with the head of such department, agency, or instrumentality and the State licensing agency, it is determined by the Secretary that (A) such building includes a satisfactory site or sites for the location and operation of a vending facility by a blind person . . .

(2) The provisions of paragraph (1) shall not apply (A) when the Secretary and the State licensing agency determine that the number of people using the property is or will be insufficient to support a vending facility, or (B) to any privately owned building, any part of which is leased by any department, agency, or instrumentality of the United States and in which, (i) prior to the execution of such lease, the lessor or any of his tenants had in operation a restaurant or other food facility in a part of the building not included in such lease, and (ii) the operation of such a vending facility by a blind person would be in proximate and substantial direct competition with such restaurant or other food facility except that each such department, agency, and instrumentality shall make every effort to lease property in privately owned buildings capable of accommodating a vending facility.

(3) For the purposes of this subsection, the term "satisfactory site" means an area determined by the Secretary to have sufficient space, electrical and plumbing outlets, and such other facilities as the Secretary may by regulation prescribe, for the location and operation of a vending facility by a blind person.

. . . .


## 20 U.S.C. § 107d-3. Vending Machine Income

. . . .

### (e) Regulations Establishing Priority for Operation of Cafeterias

The Secretary, through the Commissioner, shall prescribe regulations to establish a priority for the operation of cafeterias on Federal property by blind licensees when he determines, on an individual basis and after consultation with the head of the appropriate installation, that such operation can be provided at a reasonable cost with food of a high quality comparable to that currently provided to employees, whether by contract or otherwise.

. . . .